UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JANIS SPENCER MURRAY and
MAC MURRAY,

      Plaintiffs/Counter-Defendants,

v.                                                      No. 09-CV-1150-WJ/RHS

BOB BURT, DARIAN BURT,

      Defendants/Counter-Claimants.

and

SELECT BREEDERS SOUTHWEST,
and SMART RANCHES,

      Defendants.

**THE BURTS' RESPONSE IN OPPOSITION TO THE PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT ON BOB BURT'S LIABILITY
FOR OUSTER OF DR. MURRAY FROM COTENANCY**

**I.    INTRODUCTION.**

      The Burts respectfully request that this Court deny the Murrays' motion for partial summary judgment. This motion rests upon factual and legal theories that—until now—have been completely absent from this lawsuit. The Murrays' theory about an ouster from a tenancy-in-common is nowhere to be found in their original Complaint or their First Amended Complaint. Moreover, this motion rests upon flawed legal theories and disputed issues of fact. The Murrays fail to cite to a single court opinion from any jurisdiction where a court held a party liable for ousting his or her co-tenant from the possession of personal property.

      It is undisputed that Dr. Murray is the owner of a 10% interest in the horse *Dash Ta Fame*. Yet she claims in her motion that she has a right to continuous and exclusive possession

of the horse and that is superior to Mr. Burt's rights. The horse is not divisible; it can only be possessed by one party at any given time. It defies logic that Dr. Murray's rights as 10% owner are superior to Mr. Burt's rights as 90% owner. Not surprisingly, the Murrays' legal theory gets no support from the laws of any jurisdiction. And the facts do not support their theory either, particularly when all reasonable factual inferences are indulged in Mr. Burt's favor.

## II.     DISPUTED ISSUES OF FACT

The following is in response to the "Statement of Undisputed Material Facts" set out at pages 2-6 of the Murrays' motion for summary judgment.

1.     Not refuted.

2.     Refuted. Dr. Murray and Mr. Burt did not have any agreement—oral or written—that *Dash Ta Fame* would return to MJ Farms every breeding season for the remainder of the horse's life. Neither of the two written contracts entered into between Mr. Burt and Dr. Murray in 1997 in connection with the sale of the 10% interest in *Dash Ta Fame* made any mention about standing the horse at Dr. Murray's farm for the remainder of the horse's life or for any duration of time. *See* Agreement of June 17, 1997 (attached to the Murrays' First Amended Complaint as Exhibit B) (Doc. 108-2, filed 7-29-10); *see also* Agreement of October 14, 1997 (attached to the Murrays' First Amended Complaint as Exhibit B). In addition, Dr. Murray and Mr. Burt have entered into a number of written annual breeding contracts since 1997, and not one of those contracts includes a term that obligates Mr. Burt to stand the horse at Dr. Murray's farm for any duration of time exceeding a single breeding season. A true and accurate copy of the 2009 breeding contract between Bob Burt and Dr. Murray is attached to the Murrays' First Amended Complaint as Exhibit D. (Doc. 108-4, filed 7-29-10); *see also* annual breeding contracts for the years 1994-1997 and 1999-2008 (Exhibit C to the Burts' Motion for Partial

Summary Judgment No. 1) (Doc. No. 151-3, filed 11-12-10).  Indeed, each of the annual breeding contracts expressly contemplated that the horse might not return for the subsequent breeding season, and each such contract included a clause that addressed this possibility.  *See, e.g.,* 2009 Annual Breeding Contract, at ¶ 12 (stating that "Stallion owner [Bob Burt] agrees to leave 15% of breeding fees of paying NM bred mares only for 2009 season in the event Dash Ta Fame dies, <u>relocates</u>, or becomes unfit for service") (emphasis added) (Doc. 108-4, filed 7-29-10).  *See also* Deposition Testimony of Janis Spencer Murray, at page 163, lines 10-22 (Dr. Murray "understood as early as June 12, 1994 that there was a probability or an expectation that Dash Ta Fame may not return for the following breeding season") (Exhibit A hereto).  In addition, Dr. Murray and Mr. Burt never had any discussion in 1997 or at any other time about standing *Dash Ta Fame* at Dr. Murray's farm for the rest of the horse's life.  *See* Deposition of Janis Spencer Murray, at page 156, lines 11-19 (Exhibit A hereto).  These facts give rise to a reasonable inference that Dr. Murray did not have any plans or concerns about standing the horse at her farm for the rest of the horse's life when she decided to purchase a 10% interest in the horse in 1997.

     3.     Not refuted.

     4.     Not refuted.

     5.     Refuted.  To the extent that the Murrays are asserting that *Dash Ta Fame* remained at the Murrays' farm continuously from 1997 through the end of 2004, there is no evidence in the record to support this assertion.  The citation provided by the Murrays in their motion for summary judgment to support this averment (¶ 5 of the Burts' Proposed First Amended Counterclaim) does not support it.  The Burts did not allege in ¶ 5 (or anywhere else) that *Dash Ta Fame* remained at the Murrays' farm continuously from 1997 through the end of

2004.  The undisputed material facts and record evidence is that *Dash Ta Fame* stood with Dr. Murray pursuant to the annual breeding contracts only during the breeding season from February to July of each year.  (The only exception being 2006-2007 when *Dash Ta Fame* could not be moved to another location due to the quarantine.)

      6.      Not refuted.

      7.      Refuted to the extent that the Murrays assert that *Dash Ta Fame*'s stay at Select Breeders Southwest was "brief."  The Burts do not refute that *Dash Ta Fame* returned to MJ Farms from Select Breeders Southwest for the 2005 breeding season, but the Burts disagree that his stay at the latter facility was "brief," and the record provides no support to the Murrays' allegation on this point.  The portion of the record (¶ 5 of the Burts' Proposed First Amended Counterclaim) cited to by the Murrays in their motion for summary judgment provides no support to the Murrays' description of the stay at Select Breeders Southwest as "brief."

      8.      Not refuted.

      9.      Refuted to the extent that the Murrays assert that *Dash Ta Fame*'s stay at Select Breeders Southwest between the 2005 and 2006 breeding seasons was "brief."  The Burts do not refute that *Dash Ta Fame* returned to MJ Farms from Select Breeders Southwest for the 2006 breeding season, but the Burts disagree that his stay at the latter facility was "brief," and the record provides no support to the Murrays' allegation on this point.  The portion of the record cited to by the Murrays in their motion for summary judgment (¶ 5 of the Burts' Proposed First Amended Counterclaim) provides no support to the Murrays' description of the stay at Select Breeders Southwest as "brief."

      10.      Not refuted.

11. Not refuted. However, it is refuted that Dr. Murray's consent was required to send *Dash Ta Fame* to SMART Ranches. More accurately, Dr. Murray knew *Dash Ta Fame* was going to SMART Ranches.

12. Not refuted.

13. Refuted. The record evidence shows that Mr. Burt entered into the breeding agreement with SMART Ranches on October 31, 2009 and that Mr. Burt informed the Murrays on that date that he would not be entering into a breeding agreement with the Murrays for the 2010 breeding season.

14. Refuted. The Murrays do not support their allegation concerning the basis for Dr. Murray's "agree[ment] to th[e] annual arrangement . . . ." The Murrays provide citations to various portions of Mr. Burt's deposition testimony to support their allegedly-undisputed Fact No. 14. However, none of the cited portions of Mr. Burt's deposition lend any support to the Murrays' averment that "Dr. Murray only agreed to this annual arrangement because she knew *Dash Ta Fame* would return to stand at Dr. Murray's breeding farm, and be bred there to mares each subsequent breeding season." The cited portions of Mr. Burt's deposition testimony do not even pertain to this issue. The Murrays fail to support this assertion of fact, as required by Rule 56 of the *Federal Rules of Civil Procedure*.

15. Refuted. Dr. Murray and Mr. Burt did not have an understanding—oral or written—that *Dash Ta* Fame would return to MJ Farms for the 2008 breeding season or for the 2009 breeding season. *See* the Burts' response to the Murrays' Statement of Fact No. 2 (above), which response is incorporated herein by reference. The 2007 annual breeding contract expressly contemplated that *Dash Ta Fame* might not return for the 2008 breeding season, and the contract included a clause that addressed this possibility. *See* 2007 Annual Breeding

Contract, at ¶ 12 (stating that "Stallion owner [Bob Burt] agrees to leave 15% of breeding fees of paying NM bred mares only for 2007 season in the event Dash Ta Fame dies, <u>relocates</u>, or becomes unfit for service") (emphasis added) (Doc. 151-3, filed 11-12-10). *See also* Deposition Testimony of Janis Spencer Murray, at page 163, lines 10-22 (stating that the reason for the 15% hold-back provision was that Dr. Murray "understood as early as June 12, 1994 that there was a probability or an expectation that Dash Ta Fame may not return for the following breeding season") (Exhibit A hereto). The 2008 breeding contract included a similar hold-back clause. *See* 2008 Annual Breeding Contract, at ¶ 12 (Doc. 151-3, filed 11-12-10).

16. Not refuted.

17. Not refuted.

18. Not refuted.

19. Refuted. In the weeks prior to October 31, 2009, Mr. Burt had extensive discussions, written communications and negotiations with Mac Murray and Dr. Murray about whether *Dash Ta Fame* would return to MJ Farms for the 2010 breeding season. Ten pages of Mac Murray's deposition testimony concern these discussions and negotiations. *See* Deposition of Mac Murray, at page 23, line 10 to page 33, line 15 (Exhibit B hereto). In their motion for partial summary judgment, the Murrays cite to their Amended Complaint and the Burts' Answer to support the proposition that "Bob Burt did not seek [Dr. Murray's] consent or otherwise consult Dr. Murray before [notifying her that the horse would not return for the 2010 breeding season]." The paragraphs in the Amended Complaint (¶ 42) and the Answer (¶ 29) cited to by the Murrays do not support the Murrays' proposition on this point. Paragraph 42 of the Murrays Amended Complaint states:

> In addition, contrary to their agreement and without Plaintiffs' consent, Defendant Burt informed Plaintiffs on October 31, 2009 that Dash Ta Fame would not stand at MJ Farms for the 2010 breeding season or any year thereafter.

Doc. No. 108, at ¶ 42, filed 7-29-10.  The Burts responded in their Answer to the above-quoted allegation as follows:

> Defendants admit the allegations of ¶ 42, but it is denied that such act was contrary to any alleged agreement or required Plaintiffs' consent.

Doc. No. 110, at ¶ 29, filed 8-12-10.  This admission does not support the averment that Mr. Burt did not consult Dr. Murray before moving the stallion.

20.     Refuted.  The Murrays' alleged Statement of Fact No. 20 is not a statement of fact; rather it is a conclusion of law.  Moreover, alleged Statement of Fact No. 20 assumes that the Burts have custody and control of the horse at this time.  In fact, SMART Ranches has custody of the horse.  The horse has been in the custody of SMART Ranches (also a defendant in this lawsuit) since just prior to the filing of this lawsuit.  The Murrays filed the present lawsuit on December 7, 2009, just 37 days after Mr. Burt advised the Murrays that he would not be entering into a breeding contract with the Murrays for the 2010 breeding season.

21.     Refuted.  See the foregoing response to the alleged undisputed Fact No. 20, which is incorporated herein by reference.  The Murrays do not support their alleged Undisputed Fact No. 21 with any citations to the record.  There is no support in the record for the Murrays' contention that they made demand on Mr. Burt to return *Dash Ta Fame* to MJ Farms.  In addition, this "fact" is not material.

22.     Refuted.  The citation to Dr. Swyers' deposition that is offered by the Murrays in support of their alleged Undisputed Fact No. 22 does not support it.  At no place in the cited deposition testimony (pages 143-146) did Dr. Swyers testify that Bob Burt ever stated or represented that he (Mr. Burt) was the sole owner of *Dash Ta Fame*.  Further, Dr. Swyers

7

testified that he never asked Mr. Burt if Mr. Burt was the sole owner.  *See* Deposition of William Swyers, DVM, at page 138, line 14 to page 139, line 4 (Exhibit C hereto).  Moreover, to the extent Mr. Burt represented himself to Dr. Swyers as the owner of *Dash Ta Fame*, this was entirely consistent with how the annual breeding contracts between Dr. Murray and Mr. Burt referred to Mr. Burt between 1997 and 2009.  Every year Dr. Murray and Mr. Burt signed an annual breeding contract, and every such contract expressly identified Mr. Burt as the "owner."  None of those Annual Breeding Contracts ever identified Dr. Murray as the "owner," "co-owner," "part owner" or even "10% owner."  Those annual breeding contracts identified Dr. Murray as the "lessee" of *Dash Ta Fame*.  Dr. Murray signed all of these contracts as the "lessee."  *See* Annual Breeding Contracts for 1999 to 2009 (Ex. C to the Burts' Motion for Partial Summary Judgment No. 1, Doc. 151-3, filed 11-12-10).  *See also* Deposition of Janis Spencer Murray, at page 164, line 20 to page 165, line 22 (Exhibit A hereto) (acknowledging that she signed the annual breeding contracts as "lessee").

Furthermore, Dr. Murray and Bob Burt have identified Bob Burt as the owner of *Dash Ta Fame* in documents to third parties, including in a complaint the Murrays and Bob Burt filed as co-plaintiffs in the matter of *Mac Murray, Janis Murray d/b/a MJ Farms and Bob Burt vs. W.J. Mooring and Double LL Farms, LLC,* No. D-202-cv-2008-06490, Second Judicial District Court, Bernalillo County, NM.  *See,* attached Exhibit E, portions of Complaint in *Murray, et al. v. Mooring, et al.* ¶¶ 11-12, 20, 25; attached Exhibit F, 2005 semen service contract with Select Breeders Southwest; attached Exhibit G, 7/28/04, Agreement between MJ Farms and Bob Burt regarding frozen semen from *Dash Ta Fame* for the year 2004.

23.     Refuted.  The Murrays offer Dr. Swyers' deposition testimony (specifically page 138, line 19 to page 140, line 1) to support their putative "fact" that "[h]ad Bob Burt been

8

truthful about his co-owner, Dr. Swyers and Smart Ranches would not have bred the horse absent Dr. Murray's written consent." Dr. Swyers did not say this or anything close to it in his deposition. Further, this alleged "fact" cannot fairly be inferred from the cited deposition testimony of Dr. Swyers.

24. Refuted. The Murrays allege in their "Undisputed Fact No. 24" that "Bob Burt has failed to pay Dr. Murray her share of 2010 revenue from breeding *Dash Ta Fame* at Smart Ranches. The Murrays cited to Mr. Burt's testimony (page 93, lines 7 to 15) to support this alleged "fact." A review of Mr. Burt's cited testimony shows that it lends no support to this "Undisputed Fact No. 24." The deposition testimony relied upon by the Murrays concerned only frozen semen. The testimony was as follows:

> Q       [by Mr. Kelly] Now, in connection with all of the **frozen semen** that you've sold from Select Breeders or from Smart Ranches, you have kept 100 percent of the revenue from those sales; is that correct?
>
> A       I have the revenue from those sales, that's correct.
>
> Q       You have kept it. You've not paid 10 percent of it to the Murrays, have you?
>
> A       No, I haven't.

Ex. D hereto (Emphasis added). This colloquy concerned frozen semen. Mr. Kelly did not ask Mr. Burt about any semen other than frozen semen, and Mr. Burt's answer only pertained to frozen semen. The testimony quoted here did not concern revenues that may have been generated by SMART Ranches for breeds involving cooled semen and artificial insemination during 2010. The Murrays take Mr. Burt's deposition testimony out of context.

9

Further, there is no dispute that Dr. Murray is entitled to 10% of the breeding fees for 2010. The dispute centers around set-offs Mr. Burt is entitled to from the Murrays for unpaid fees that Murrays owe Mr. Burt.

25.     Refuted. The alleged "Undisputed Fact No. 25" is a legal conclusion and not a statement of fact. Furthermore, Dr. Murray and Mr. Burt have entered into numerous written annual breeding contracts since 1997. None of those contracts includes a term that obligates Mr. Burt to stand the horse at Dr. Murray's farm for any duration of time exceeding a single breeding season. A true and accurate copy of the 2009 breeding contract between Bob Burt and Dr. Murray is attached to the Murrays' First Amended Complaint as Exhibit D. (Doc. 108-4, filed 7-29-10); *see also* annual breeding contracts for the years 1994-1997 and 1999-2008 (Exhibit C to the Burts' Motion for Partial Summary Judgment No. 1) (Doc. No. 151-3, filed 11-12-10). Each annual breeding contract expressly contemplated that *Dash Ta Fame* might not return for the subsequent breeding season, and each such contract included a clause that addressed this possibility. *See, e.g.,* 2009 Annual Breeding Contract, at ¶ 12 (stating that "Stallion owner [Bob Burt] agrees to leave 15% of breeding fees of paying NM bred mares only for 2009 season in the event Dash Ta Fame dies, <u>relocates</u>, or becomes unfit for service") (emphasis added) (Doc. 108-4, filed 7-29-10). Dr. Murray agreed at her deposition that the 15% hold-back clause addressed the possibility that the horse might not return in the successive breeding season. *See* Deposition Testimony of Janis Spencer Murray, at page 163, lines 10-22 (stating that Dr. Murray "understood as early as June 12, 1994 that there was a probability or an expectation that Dash Ta Fame may not return for the following breeding season") (Ex. A hereto). In addition, Dr. Murray and Mr. Burt never had any discussion in 1997 or at any other time about standing *Dash Ta Fame* at Dr. Murray's farm for the rest of the horse's life.

10

### III.   ARGUMENT

**A.   Point One:  The present motion for summary judgment does not relate to any claim asserted by the Murrays in their First Amended Complaint.**

The Murrays' First Amended Complaint encompasses 11 separate causes of action against the Burts. The Murrays' motion does not relate in any way to any of those 11 causes of action. Moreover, the First Amended Complaint does not make any factual or legal allegations about the existence of a tenancy-in-common for *Dash Ta Fame*. Indeed, none of the terms suggestive of a tenancy-in-common ("co-tenant," "co-tenancy," "tenant-in-common," "tenancy-in-common," "ouster" or "partition") appear anywhere in the 132 paragraphs of the Murrays' First Amended Complaint. Moreover, the Murrays have not asserted a claim for partition of the alleged tenancy-in-common that is the subject of the present motion.[1]

This Court should deny the present motion on account of the Murrays' failure to comply with the rules of notice pleading and because there is simply no claim for ouster of co-tenant raised in the amended complaint. The requirement for notice pleading recognizes that it is unfair to require a party to respond to a particular legal or factual theory if the party is unable to reasonably determine from the pleadings that the other party is asserting that particular legal or factual theory. The Tenth Circuit has explained this well-settled rule in the following terms:

> The Federal Rules of Civil Procedure require a plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard, known as "notice pleading," is intended to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon

---

[1] Partition is the remedy that courts typically grant when tenants-in-common are unable to cooperate with one another with respect to property comprising a tenancy-in-common. If the court finds that the subject property is not partitionable then the appropriate remedy is an order that the property be sold and the proceeds paid over to the parties in proportion to their respective undivided interests. *See Poenisch v. Quarnstrom*, 361 S.W.2d 367, 372 (Tex. 1962); *see also Martinez v. Martinez*, 2004-NMCA-007, ¶ 18, 83 P.3d 298, 302 (2003) (stating that "[t]he right to partition is an inherent element of the tenancy in common . . . ."). Presumably, *Dash Ta Fame* is not partitionable since there would be no way to disassociate Dr. Murray's 10% interest in the horse from Mr. Burt's 90% interest without killing the horse. While the horse might have some marginal value if it were slaughtered, all parties to this action agree that its value is much greater as a living semen-producing stud horse.

11

> which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Although we "do not require a claimant to set out in detail the facts upon which he bases his claim," id., we do require enough specificity for the defendant to be able to respond to the allegations.

*Barfield v. Commerce Bank, N.A.,* 484 F.3d 1276, 1281 (10th Cir. 2007). Until the Murrays filed the present motion, the Burts had no way to reasonably discern that this case might involve a claim of ouster in the context of an alleged tenancy-in-common. Discovery is now closed. If the ouster claim is allowed to go forward, then the Burts will be forced to defend against a claim which is not pleaded and of which they were unaware during discovery. Because the Murrays are moving for summary judgment on a claim that has not been pleaded and forms no part of this case, the motion should be denied.

    **B.**    **Point Two: The concept of "ouster" is inapplicable to a tenancy-in-common involving personal property.**

The Murrays ask this Court to rule that Mr. Burt has "ousted" Dr. Murray from the tenancy-in-common that exists for *Dash Ta Fame*. Another major problem with the Murrays' argument on this point is that the concept of "ouster" applies to tenancies-in-common involving real property, not personal property. Assuming that a tenancy-in-common does exist for *Dash Ta Fame*[2], it involves personal property, not real property. All of the ouster cases relied upon by the Murrays involved ouster in the context of real property. The legal significance of ouster in these cases usually had to do with whether and when the limitations period began to run, as that issue related to a claim of adverse possession.[3] There is no claim of adverse possession here, and

---

[2] The Burts assume for purposes of this argument only that a tenancy-in-common exists between Dr. Murray and Mr. Burt for *Dash Ta Fame*.

[3] A tenant-in-common may claim title to property against his co-tenant only if he has affirmatively ousted the co-tenant. The limitations period applicable for adverse possession starts to run against the co-tenant when this ouster occurs. Thus, a party claiming adverse possession against his co-tenant must make a greater showing than he must make to prove adverse possession against non-co-tenants. Where a party claims adverse possession against his co-tenant, it is not enough that the possession was open, notorious and hostile. There must also be an affirmative ouster, and that ouster starts the running of the limitations period. *See In re Estate of Duran*, 2003-NMSC-008, ¶ 31, 66 P.3d 326, 333.

the property in question—the stallion *Dash Ta Fame*—is personalty. Accordingly, the question whether an ouster occurred is not legally or factually relevant to any claim in this action.

None of the cases cited to by the Murrays in their brief supports the notion that a tenant-in-common may maintain an action for ouster against his or her co-tenant where the subject matter of the tenancy-in-common is personal property. Nor do the cases support the Murrays' claim that an ouster has occurred under the facts of this case. In fact, the cases cited by the Murrays support the opposite conclusion. The Murrays' reliance upon *Rocky Mountain Stud Farm Co. v. Lunt*, 151 P.2d 521 (Utah 1915), is misplaced.[4] That case involved a tenancy-in-common for personal property (horses). But that case did not involve any claim for or discussion of "ouster." Moreover, the Supreme Court of Utah recognized there that where a tenancy-in-common involves "inseverable" personal property, "the tenant in actual possession of the chattel may retain possession against his cotenants." *Id.* at 526. That Court went on:

> [A]lthough it is competent for the joint tenants to make a subdivision of time for the exclusive occupancy (possession) of the whole for the joint property, one joint tenant cannot recover for exclusive possession of the premises (property) against his cotenant.

*Id.* This statement of the law has been repeated by the appellate courts of Missouri. *See Nye v. James*, 373 S.W.2d 655, 659 (Mo. Ct. App. 1963) ("The general rule is that a tenant in common who has actual possession of indivisible personalty not susceptible of joint and equal possession may retain possession to the exclusion of his cotenant or cotenants."); *Burkhart v. Graven Realty, Inc.*, 639 S.W.2d 217 (Mo. Ct. App. 1982) ("[A]n action for conversion will not ordinarily lie

---

[4] The Murrays argue in their brief that Utah law controls the issues raised by their motion. The Burts do not agree, and the Burts contend that New Mexico law applies. The Murrays have already stipulated that New Mexico law "governs this case." See Joint Status Report and Provisional Discovery Plan (JSR) (filed herein on March 22, 2010) (Doc. No. 47, at p. 3). In any event, the Burts contend that there is no inconsistency between New Mexico and Utah law, as the laws of those two states pertain to the substantive property law questions raised by this motion.

13

merely because one co-owner of a chattel refuses to surrender it to another . . . .") (quoting 20 Am. Jur.2d, *Cotenancy and Joint Ownership* § 86 (1965)).

None of the other appellate opinions cited to by the Murrays in their brief support the notion that an "ouster" may occur where the subject of the co-tenancy is personal property. The case of *Utah Oil Refining Co. v. Leigh*, 96 P.2d 1100 (Utah 1939), involved an action to partition real property, and the court there held that no ouster had occurred. *Id.* at 1104. The two other cases relied upon by the Murrays (*Gillmor v. Gillmor,* 694 P.2d 1037 (Utah 1984) and *Olwell v. Clark*, 658 P.2d 585 (Utah 1982)) also involved real property. The question of ouster arose in the *Olwell* case in connection with a claim of adverse possession by one co-tenant against another, *id.* at 588-89, and most appellate opinions to consider questions about ouster have involved similar claims for adverse possession. In such cases, the appellate court considered whether one co-tenant was "ousted," from the property, so as to start the statutory adverse-possession period. *See, e.g., In re Estate of Duran*, 2003-NMSC-008, ¶ 31, 66 P.3d 326, 333; *Poenisch v. Quarnstrom*, 361 S.W.2d 367, 372 (Tex. 1962); *Curtis v. DesChamps,* 350 S.E.2d 201 (Ct. App. S.C. 1986); *Cook v. Rochford*, 60 So.2d 531 (Fla. 1952); and *Graham v. Inlow*, 790 S.W.2d 428 (Ark. 1990). None of the cases relied upon by the Murrays lends any support to the notion that where a co-tenancy exists for personal property, one co-tenant may "oust" the other co-tenant by taking exclusive possession of the property.

      C.    <u>**Point Three:**</u>   <u>**There was no "ouster" of Dr. Murray from any tenancy-in-common that may exist for *Dash Ta Fame*.**</u>

Even if one assumes—for the sake of argument—that an "ouster" can occur in the context of personal property, the facts do not support the Murrays' ouster theory, particularly when all factual inferences are drawn in Mr. Burt's favor. At bottom, the Murrays argue that Dr. Murray (as the 10% owner of *Dash Ta Fame*) has a right to exclusive possession of the horse and that

14

Mr. Burt (the 90% owner) has no right of possession whatsoever. This makes no sense. And the arguments advanced by the Murrays get no support from the factual record.

First, the Murrays argue that the "course of dealing" between Dr. Murray and Mr. Burt vested in Dr. Murray the right to possess the horse. This theory gets no support from the facts. Dr. Murray and Mr. Burt did not have any agreement—oral or written—that *Dash Ta Fame* would return to MJ Farms every breeding season for the remainder of the horse's life. To the contrary, neither of the two written contracts entered into between Mr. Burt and Dr. Murray in 1997 in connection with the sale of the 10% interest in *Dash Ta Fame* made any mention about standing the horse at Dr. Murray's farm for the remainder of the horse's life or for any duration of time. *See* Agreement of June 17, 1997 (attached to the Murrays' First Amended Complaint as Exhibit B) (Doc. No. 108-2, filed 7-29-10); *see also* Agreement of October 14, 1997 (attached to the Murrays' First Amended Complaint as Exhibit B).

In addition, Dr. Murray and Mr. Burt signed numerous annual breeding contracts between 1997 and 2009. Not one of those contracts states or even suggests that the horse will stand at Dr. Murray's farm for any duration of time exceeding a single breeding season. To the contrary, each of these annual breeding contracts includes language indicating that the horse might not return for the subsequent breeding season and providing for what would happen if the horse did not return. *See, e.g.,* 2009 Annual Breeding Contract, at ¶ 12 (stating that "Stallion owner [Bob Burt] agrees to leave 15% of breeding fees of paying NM bred mares only for 2009 season in the event Dash Ta Fame dies, <u>relocates</u>, or becomes unfit for service") (emphasis added) (Doc. 108-4, filed 7-29-10); *see also* annual breeding contracts for the years 1994-1997 and 1999-2008 (Exhibit C to the Burts' Motion for Partial Summary Judgment No. 1) (Doc. No. 151-3, filed 11-12-10). Dr. Murray acknowledged during her deposition that these clauses were

included within the annual breeding contracts to address the potential that for any given year *Dash Ta Fame* might not come back to MJ Farms the next year. At her deposition, the Burts' lawyer asked Dr. Murray if she "understood as early as June 12, 1994 that there was a probability or an expectation that Dash Ta Fame may not return for the following breeding season." Dr. Murray answered, "That's true," to this question. *See* Deposition Testimony of Janis Spencer Murray, at page 163, lines 10-22 (Exhibit A hereto). This testimony from her own mouth belies Dr. Murray's argument that she and Mr. Burt agreed that she would always have an absolute right to stand the horse at her farm forever.

In addition, it is undisputed that Dr. Murray and Mr. Burt never had any discussion in 1997 or at any other time about standing *Dash Ta Fame* at Dr. Murray's farm for the rest of the horse's life. *See* Deposition of Janis Spencer Murray, at page 156, lines 11-19 (Exhibit A hereto). These facts establish that Dr. Murray and Mr. Burt did not have an agreement (express or implied) that *Dash Ta Fame* would stand at MJ Farms every year for the duration of the horse's life.

Dr. Murray also argues in the present motion that Mr. Burt misrepresented the status of *Dash Ta Fame*'s ownership to Dr. Swyers of SMART Ranches and that this "misrepresentation" worked to "oust" her from her tenancy-in-common. Even if one assumes for the sake of argument[5] that a misrepresentation about ownership of personal property can work an "ouster" of a co-tenant, there was no misrepresentation here. There is no support in the record for Dr. Murray's allegation that Mr. Burt ever told Dr. Swyers or anyone else at SMART Ranches that he was the sole and exclusive owner of *Dash Ta Fame*. Dr. Swyers never testified at his deposition that Mr. Burt told him that he (Mr. Burt) owned 100% of *Dash Ta Fame*. To the

---

[5] The Burts do not agree that such a misrepresentation can be the basis for an "ouster," but they are assuming here—for purposes of this argument—that a misrepresentation about ownership might give rise to an ouster.

16

contrary, Dr. Swyers testified that he never asked Mr. Burt if Mr. Burt was the sole owner.  *See* Deposition of William Swyers, DVM, at page 138, line 14 to page 139, line 4 (Ex. C hereto).

Furthermore, if Mr. Burt did tell Dr. Swyers that he was the "owner" of *Dash Ta Fame*, this was entirely consistent with the language in the annual breeding contracts that Dr. Murray signed every year for more than a decade.  Each annual breeding contract identified Mr. Burt as the "owner."  None of those annual breeding contracts ever identified Dr. Murray as the "owner," "co-owner," "part owner" or even "10% owner."  Those annual breeding contracts identified Dr. Murray as the "lessee" of *Dash Ta Fame*.  Dr. Murray signed all of these contracts as the "lessee."  *See* Annual Breeding Contracts for 1999 to 2009 (Ex. C to the Burts' Motion for Partial Summary Judgment No. 1, Doc. 151-3, filed 11-12-10).  And Dr. Murray acknowledged in her deposition that she signed these contracts as the "lessee."  *See* Deposition of Janis Spencer Murray, at page 164, line 20 to page 165, line 22 (Ex. A hereto).  If Dr. Murray believed for all those years that Bob Burt's representing himself as the owner of the horse was offensive to her rights as 10% owner, then she should not have signed them.  The fact that she did sign them gives rise to at least a reasonable inference that she had no objection to Mr. Burt representing himself as the "owner" of the horse.

Finally, Dr. Murray has identified Bob Burt as the "owner" of *Dash Ta Fame* in other documents that she has given to third parties, without identifying herself as a co-owner.  Exhibit E hereto is a copy of a complaint that Dr. Murray and Mr. Burt filed (as co-plaintiffs) in New Mexico State District Court in 2008.  That complaint repeatedly refers to Mr. Burt as the "owner" of *Dash Ta Fame*.  *See* Exhibit E.  In addition, Dr. Murray signed a semen service contract with Select Breeders Southwest in 2005; that document identified Mr. Burt as the "owner" of the stallion, and it identified Dr. Murray as the "agent 10%."  *See* Exhibit F hereto.

And Dr. Murray also signed a contract "regarding frozen semen" with Mr. Burt in 2004.  Again, that contract indentified Mr. Burt as the "owner," and it made no mention of Dr. Murray's interest in the horse.  *See* Exhibit G.

Dr. Murray also argues in her brief that Dr. Swyers (and his company SMART Ranches) would not have accepted *Dash Ta Fame* into his facility if Mr. Burt had disclosed Dr. Murray's 10% ownership interest to Dr. Swyers.[6]  This is pure speculation that finds no support in the record.  Dr. Swyers never testified in his deposition that he would have refused the horse (absent Dr. Murrays' written consent) if he had known that Mr. Burt was not the sole owner.  Instead, he testified that he never asked Bob Burt if Bob was the sole owner; he just assumed he was.  *See* Deposition of William Swyers, DVM, at page 138, line 25 to page 139, line 4 (Exhibit C hereto).  And he never said that if he had known that Mr. Burt owned less than 100% he would have required Dr. Murray's written consent before taking the horse into SMART Ranches.  In fact, Dr. Swyers testified that he will continue to collect semen from *Dash Ta Fame*, even though he now knows about Dr. Murray's 10% interest.  *See id.*, at page 143, lines 2 to 7.  This testimony gives rise to a reasonable inference that Dr. Swyers—had he had knowledge of Dr. Murray's 10% interest from the outset—would nevertheless have agreed to stand the stallion at SMART Ranches.  The Murrays' misrepresent the tenor of Dr. Swyers' deposition testimony, as it relates to their "Undisputed Fact No. 23."[7]  At a minimum, the Murrays engage in a leap of logic that gets no support from the factual record.

---

[6]   The Murrays make this argument at page 11 of their Motion for Partial Summary Judgment on Bob Burt's Liability for Ouster of Dr. Murray from Cotenancy (Doc. No. 160).

[7]   The Murrays' "Undisputed Fact No. 23" is set out at page 5 of their Motion for Partial Summary Judgment on Bob Burt's Liability for Ouster of Dr. Murray from Cotenancy (Doc. No. 160). The Murrays cite to page 138, line 19 to page 140 of Dr. Swyers' deposition testimony to support Fact No. 23.

## IV.     CONCLUSION

The undisputed facts do not support the partial summary judgment requested by the Murrays. There is no claim for ouster of a co-tenant in the Amended Complaint and until now the Murrays never claimed that Mr. Burt is liable for ousting Dr. Murray from their tenancy-in-common. Indeed, the Murrays never suggested that a tenancy-in-common existed before they filed this motion. Their claim for summary judgment at this juncture offends principles of "notice pleading" espoused by the *Federal Rules of Civil Procedure*. Moreover, there is no support in the substantive property law of Utah or New Mexico (or any other state) for the proposition that a tenant-in-common "ousts" a co-tenant by maintaining possession of personal property comprising the tenancy-in-common.

Dr. Murray (the owner of a 10% interest in the horse) makes the astonishing claim that she is entitled to exclusive possession of the horse, even though there is no document or verbal agreement to support this claim. This claim is all the more astonishing when one considers that Dr. Murray signed annual breeding contracts every year for more than a decade, and every one of those contracts recognized the possibility that Mr. Burt might not return *Dash Ta Fame* to MJ Farms in the subsequent year. The Burts respectfully request that this Court deny the Murrays' motion for summary judgment.

        Respectfully submitted,

        SUTIN, THAYER & BROWNE
        A Professional Corporation

        *Electronically Filed by:*
        Christopher A. Holland
        Stevan Douglas Looney
        6565 Americas Parkway N.E., Suite 1000
        Albuquerque, NM  87110
        Telephone:  (505) 883-2500
        Facsimile:   (505) 888-6565
        E-mail:  cholland@sutinfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of November, 2010, I filed the Burts' Response in Opposition to the Plaintiffs' Motion For Partial Summary Judgment On Bob Burt's Liability For Ouster Of Dr. Murray From Cotenancy electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic filing:

| | |
|---|---|
| John J. Kelly, Esq.<br>Angelo J. Artuso, Esq.<br>Daniel M. Alsup, Esq.<br>Modrall, Sperling, Roehl, Harris & Sisk, P.A.<br><br>***Attorneys for Plaintiffs*** | Paul M. Kienzle, III<br>Scott & Kienzle, P.A.<br><br><br><br>***Attorneys for Defendant<br>Smart Ranches*** |

*Electronically Filed by:*
Christopher A. Holland

1844084.doc